[No. 28876. Department One. October 23, 1942.]

*In the Matter of the Appeals by the Employees of the*
NORTH RIVER LOGGING COMPANY.[1]

[1]Reported in 130 P. (2d) 64.

*Oscar A. Zabel* and *Philip J. Poth,* for appellant.

*The Attorney General* and *George W. Wilkins, As-sistant,* for respondent.

BLAKE, J.—This is an appeal from a decree of the superior court confirming an order of the commissioner of unemployment and placement. By his order, the commissioner affirmed the decision of the appeal tribunal denying appellants' claims for compensation on the ground that the unemployment, with respect to which rights to benefits were asserted, was "due to a stoppage of work . . . because of a labor dispute . . . ," in contemplation of § 5, chapter 162, Laws of 1937, p. 581, as amended, Rem. Supp. 1941, § 9998-105 [P. C. § 6233-305] (e).

The facts as found by the appeal tribunal (whose findings are binding on the courts in the absence of fraud or arbitrary or capricious conduct (Rem. Supp. 1941, § 9998-106 [P. C. § 6233-306] (i))— *In re St. Paul & Tacoma Lbr. Co.,* 7 Wn. (2d) 580, 110 P. (2d) 877) may be summarized as follows:

In 1940, the North River Logging Company was operating a logging project, in connection with which it employed from forty to seventy men. The employees were all members of International Wood Workers of America (CIO), Local 3-2, which had a contract with the company providing for a five-day week, observance of legal holidays, and time and a half for work performed on Sundays and holidays.

September 2, 1940, was Labor Day, and, in accordance with the terms of the contract, operations were shut down. Thursday, September 5th, it became noised about that the company intended to do certain loading

and maintenance work on Saturday, the 7th, to make up for time lost by the observance of Labor Day. Having learned of this, the business agent of the union, Denee Dyer, called up Herman Hobi, camp foreman for the company,

" . . . to remind him that under their working agreement the men were entitled to the higher rate for Saturday work. Hobi told Dyer, but in stronger words, to mind his own business. . . ."

On Friday, the 6th, the rigging and maintenance crews were ordered to report for work the following day on a *"straight time"* basis. They were advised that, unless they reported and worked on that basis, the company "would shut the operation down for the rest of the year." The next morning, Dyer appeared at the entrance to the company's property, intercepted the men, and advised them not to work unless they were assured of the overtime rate. Hobi appeared on the scene and reiterated his determination to pay only straight time, and, in the event the men refused to work on that basis, to shut down operations for the rest of the year. The men, with one exception, refused to work.

On the following Monday, the 9th, all the employees, including the filer and cutting crew, who had not been called for Saturday, reported for work. They found the camp shut down. The union then filed a complaint with the National Labor Relations Board, charging that the employees were locked out. A field examiner for the board made an investigation and effected a settlement of the dispute, under which the company agreed to reinstate all employees as of September 6th and resume operations on October 14th.

In the meantime, the representatives of the logging company and about seventy other employers had been negotiating with delegates from Local 2 and other

union officials affiliated with the southern and northern Washington district councils of the International Woodworkers of America in an effort to arrive at a uniform working agreement. On or about September 16th, Dyer called on Hobi and submitted an agreement which Local 2 had with another operator, asking that the company agree to it and resume operations under it. Hobi declined, saying that he would await the result of the "twin-district" negotiations above referred to. The company, however, was not asked to sign that agreement because Local 2 refused to ratify it.

There can be no question that the claimants were at all times ready, able, and willing to work on and after September 9th. It cannot be denied that their unemployment between that date and October 14th was involuntary as a matter of fact. The question for our determination, however, is whether their unemployment was involuntary in contemplation of Rem. Supp. 1941, § 9998-105 (e), which provides that

"An individual shall be disqualified for benefits: . . . For any week with respect to which the commissioner finds that his total or partial unemployment is due to a stoppage of work which exists because of a *labor dispute* at the factory, establishment, or other premises at which he is or was last employed." (Italics ours. There are two provisos to the section with which we are not presently concerned.)

 Under a well-established canon of *statutory* construction, the foregoing section makes an exception to the generally declared purpose of the act to provide compensation in all cases of involuntary unemployment. *In re Steelman*, 219 N. C. 306, 13 S. E. (2d) 544. For the rule is that, "Where a statute expresses first a general intent, and afterwards an inconsistent particular intent, the latter will be taken as an exception from the former and both will stand." 1 Lewis' Sutherland Statutory Construction (2d ed.),

p. 513, § 268. *Rodgers v. United States,* 185 U. S. 83, 46 L. Ed. 816, 22 S. Ct. 582; *Crane v. Reeder,* 22 Mich. 322.

So, the question for determination, as it finally resolves itself, is whether or not a lockout is a labor dispute in contemplation of Rem. Supp. 1941, § 9998-105 (e). For it is clear that the shutdown from September 9th to October 14th was a lockout in the generally accepted definition of the terms: a suspension of operations by the employer resulting from a dispute with his employees over wages, hours, or working conditions. That a lockout is a labor dispute in contemplation of the unemployment compensation act, we think equally clear for several reasons:

*First.* Viewed in its social and economic aspects, the lockout is a weapon in the hands of the employers which is a counterpart to the weapon of strike held by the workers.

"A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lock out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms." *Iron Molders' Union v. Allis-Chalmers Co.,* 166 Fed. 45, 52, 20 L. R. A. (N. S.) 315.

*Second.* The essential features of our unemployment compensation act are borrowed from the English acts, the original of which was passed in 1911. It is important, therefore, to ascertain the construction placed upon the British acts in construing our own. For it is a general rule of statutory construction that a statute adopted from another state or country is presumed to have been taken with the construction there placed upon it. *In re Third, Fourth, & Fifth Avenues, Seattle,* 49 Wash. 109, 94 Pac. 1075, 95 Pac. 862; *Bickford v. Eschbach,* 167 Wash. 357, 9 P. (2d) 376.

The English decisions are uniform in holding that a lockout is a labor dispute in contemplation of the na-

tional insurance acts. Decisions given by the umpire prior to April 19, 1928, case No. 5117, pp. 364, 365:

" 'If the question had in this case been raised for the first time I should have had to decide for myself whether a stoppage of work brought about by a lock-out at a factory at which there was not otherwise a dispute, but which was declared in support of one of the parties to a trade dispute at another factory, is a stoppage of work which is due to a trade dispute at the factory from which the employees are so locked out, but the question has already been decided by the Umpire in a number of cases, and I do not feel at liberty (whatever my own opinion unaided by the wisdom of any predecessor might have been) to depart from those decisions. In several cases on the Act of 1911 the Umpire in similar circumstances decided that the "lock-out in itself constitutes a trade dispute" or "extended the trade dispute" to the premises at which the lock-out was declared. This principle he applied in Decisions 336 and 1753 (Benefit, 1911 Act), 2170, 2239, 3793 (O. W. D.) and 437 among others.

" 'The construction put upon the Act of 1911 by the Umpire was well known at the time of the passing of the Act of 1920, and I must assume that, when reenacting in the Act of 1920 the trade dispute section of the Act of 1911, Parliament intended that the later Act should be construed in the same way that the earlier Act had been construed.' "

*Third.* Under statutes of identical or of similar import as Rem. Supp. 1941, § 9998-105 (e), the administrative officers of all states, except Maryland, where the question has arisen, have adopted the same view. 1 Prentiss-Hall, Unemployment Insurance Service, p. 27164.

*Fourth.* Recognizing the lockout to be a labor dispute in contemplation of such provisions as Rem. Supp. 1941, § 9998-105 (e), the legislatures of some states have, in specific terms, eliminated or qualified

it as a ground of disqualification for benefits: Arkansas, Acts of 1941, Act 391; Connecticut, Supplement to General Statutes, chapter 280a, p. 387, § 718f; Kentucky, Acts of 1938, chapter 50, p. 330, § 9 (4); Mississippi, General Laws of 1940, chapter 295, p. 498, § 5 (d) (1); West Virginia, Acts of 1941, chapter 97, Art. 6, p. 406, § 4 (4).

In this connection, it may be noted that our own act, in § 5 (2) (a) (Rem. Supp. 1941, § 9998-105 (2) (a)), recognizes the lockout as a labor dispute in that it provides that an individual shall not be disqualified for benefits for refusing to accept work "if the position offered is vacant due directly to a strike, *lockout, or other labor dispute.*" (Italics ours.)

*Fifth.* Under facts basically indistinguishable from those in the case at bar, several courts, construing statutes identical or similar to Rem. Supp. 1941, § 9998-105 (e), have held that the unemployment for which the claims were made grew out of a labor dispute. *Barnes v. Hall,* 285 Ky. 160, 146 S. W. (2d) 929, certiorari denied, 314 U. S. 628; *Block Coal & Coke Co. v. United Mine Workers, etc.,* 177 Tenn. 247, 148 S. W. (2d) 364, 149 S. W. (2d) 469; *Department of Industrial Relations v. Pesnell,* 29 Ala. App. 528, 199 So. 720.

In conclusion, we should briefly notice a contention made by appellants, which involves an interpretation of the commissioner's record. It will be recalled that the filer and members of the cutting crew were not called for work on Saturday, September 7th. They did report along with the rigger and maintenance crews on the 9th. Appellants assert that these men were allowed compensation, and urge that the commissioner, consequently, was arbitrary and capricious in denying benefits to appellants. We do not think this contention is borne out by the record. As we read and understand it, no benefits were allowed any

of the employees during the period the operations were shut down, to wit, September 9th to October 14th.

Judgment affirmed.

ROBINSON, C. J., MILLARD, STEINERT, and JEFFERS, JJ., concur.

