[Sac. No. 5941.   In Bank.   Sept. 14, 1949.]

D. R. McKINLEY et al., Petitioners, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Respondents.

240

Gilford G. Rowland and Rowland & Craven for Petitioners.

Fred N. Howser, Attorney General, and Charles W. Johnson, Deputy Attorney General, for Respondents.

Charles P. Scully as Amicus Curiae, on behalf of Respondents.

EDMONDS, J.—Seven employers, members of the Sacramento Wholesale Bakers Association, petition for a writ of mandate directing the Insurance Appeals Board to vacate and set aside certain of its decisions granting benefits to claimants, and to compel the director of employment to strike out all charges made to the accounts of the petitioners because of such payments. As a result of the rather unique administrative procedure which was followed, the petitioners now concede that the awards cannot be vacated; however, the charges against the employers' accounts may be stricken from the records if the determination of the board was erroneous. The case is presented upon an agreed statement of facts, and the only question for decision is whether the board correctly determined that the petitioners' employees are not excluded from benefits under section 56 of the Unemployment Insurance Act [Stats. 1935, p. 1226; 3 Deering's Gen. Laws, Act 8780d], as amended in 1945.

The association, comprising all of the Sacramento "machine shop baking industry." was organized in 1935 for the purpose of representing its members in labor relations. Prior to the formation of the association, either individually or jointly, the employers had entered into contracts with the Bakery and Confectionery Workers' International Union of America, Local 85. Since 1935, a master contract upon an industry-wide basis was utilized, and on behalf of the employers, executed by the executive secretary of the association. Prior to 1946, each employer indicated his concurrence by signing the master contract; since that year the employers have declined to do so, taking the position that each of them is bound by the action of the secretary of the association.

According to the agreed statement, "[t]he members of the Association understood among themselves that they would act as a unit in collective bargaining matters, and that a strike against any one or more members would be treated by them as a strike against all. This position had been known to the union by statements, letters and prior action (p. 37, *l.* 25, p. 38,

*l.* 4; p. 39), but the union at no time expressed either agreement or disagreement with this position. The collective bargaining agreement in force during the time involved herein contained no provision on this point.'' The page references are to testimony in the transcript of proceedings before the referee. This testimony is referred to in the petitioners' reply brief as uncontroverted and is summarized as follows: ''That in the past work stoppages have occurred in the baking industry in Sacramento, and that the Union took action against less than all of the members of the Bakers Association, and that when such action was taken, the others closed. . . .'' This summarization is not contradicted by the union; clearly the parties agree that, when in the past the union invoked economic sanctions against less than all of the employers who were parties to the master contract, the others closed their places of business.

By the master contract made in January, 1946, uniform wages, hours and working conditions were established for the employees of all member employers. Early in 1947, less than 30 days prior to the expiration date of the contract and in accordance with its terms, the union advised the executive secretary of the association that it desired to amend the contract generally as to wages, hours and working conditions.

During the negotiations which followed, the members of the union employed in the petitioners' plants authorized the negotiating committee, in its discretion, to call a strike against any one or more of the employers. When negotiations broke down, the union declared a strike against the Butter Cream Baking Company, one of the members of the association. Pickets were stationed at the Butter Cream plant and remained until a month later, when an agreement was reached between the union and the association for a new master contract.

On the day that the picket line was established, a representative of the employers stated to a union representative at the scene that the strike against one employer would be treated as a strike against all. The union representative replied that he had expected such a result. Thereupon, and within the following few days, the other employers closed their plants. The employees in these bakeries continued to work until the plants were closed.

Throughout the entire period of the dispute and until its settlement, the union's sole demand was for changes in the

contract with the association. At no time, either before or after the picket line was established, were demands made upon the individual employers. After the other bakeries ceased operations, the picket line included employees from bakeries other than the struck plant.

Section 56 of the Unemployment Insurance Act, as amended in 1945, provides: "An individual is not eligible for benefits for unemployment, and no such benefits shall be payable to him under any of the following conditions: (a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he is employed." (Stats. 1945, ch. 1178, p. 2225; 3 Deering's Gen. Laws, 1945 Pocket Supp., Act 8780d, § 56.)

The petitioners contend that the employees who have claimed and received benefits are within the exclusionary provisions of the act in that (1) the employers had "good cause" to close their plants under the rule laid down in *Bunny's Waffle Shop* v. *California Emp. Com.*, 24 Cal.2d 735 [151 P.2d 224]; (2) the employees made the strike at Butter Cream their own and voluntarily participated in it; and (3) section 56 must be construed liberally "to promote the purpose of the Act, i. e., to provide benefits only to those who are involuntarily unemployed through no fault of their own." The respondents reply that (1) according to the stipulated facts, the employees did not leave their work voluntarily; (2) the cause of the unemployment was the closing of the plants and not the trade dispute; and (3) the board's determination as to unemployment benefits is based upon certain language in the waffle shop case.

Provisions disqualifying from benefits an employee whose unemployment is the result of a labor dispute are to be found in the unemployment compensation statutes of all of the 48 states. In most jurisdictions, however, the Legislature has made certain exceptions to the general disqualification provision. (49 Columb.L.Rev. 550 [1949].) Lack of such express statutory exception in the California act led this court in *Bodinson Mfg. Corp.* v. *California Emp. Com.*, 17 Cal.2d 321, 328 [109 P.2d 935], to state that disqualification "depends upon the fact of voluntary action" by the claimant. That decision recognized the obvious legislative intent that persons who are involuntarily and innocently out of work as the result of a labor dispute should not suffer by loss of unemploy-

ment benefits. Accordingly, the right to benefits under section 56 of the statute was said to depend upon whether the worker left his job of his own free will or was forced to do so because of the acts of others.

The disagreement between the parties to the present controversy arises from the difference in their respective views as to the cause of the claimants' unemployment. The employers contend that it was the union action of striking the Butter Cream plant which caused the shutdown; the respondents argue that the employees were willing to work in the petitioners' plants and did so until they were locked out.

In *Bunny's Waffle Shop* v. *California Emp. Com.*, 24 Cal. 2d 735 [151 P.2d 224], certain restaurant owners sought to compel their employees, through their union, to deal with a newly organized San Francisco Employers' Council in obtaining a collective bargaining agreement. The union refused to bargain except with the individual employers as had been the custom. To compel joint negotiations, the restaurant owners made a reduction of 25 per cent in wages, and a six-day week with split shifts was established instead of the existing five-day week and straight shift. When the employees were paid at the lower rate, they left their jobs. Subsequently the restaurants were closed down. Later, the employers sued to obtain the relief demanded in the present case and the question presented for decision was whether the employees were disqualified from receiving benefits under the Unemployment Insurance Act because they left their work.

The commission contended that, in effect, the employers' action constituted a lockout. This position was upheld because the court determined, after reviewing the employers' acts, that they were disassociated from any bona fide proposal in connection with the dispute, hence, ''when claimants left their work, they left because of this economic weapon and not because of the trade dispute then in existence.'' In reaching its conclusion, the court recognized that, in reality, the form of the cessation of employment is not controlling and the determinative factor is the volitional cause of the work stoppage. In other words, although the employees left work of their own choice, that choice was not freely made but was compelled by the economic weapon which the employers used. This is the only sound and fair way to apply the subjective volitional test stated in *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935].

Applying this rule to the issue in the present case, the stipulated facts clearly show that the employees of the Sacramento bakeries left their work voluntarily and, therefore, should have been excluded from receiving unemployment benefits. Continuously since 1935, the union and the association, by collective bargaining, had entered into one master contract which included all of the employers and the employees of the baking industry of Sacramento. It seems clear that under such industry-wide, single contract negotiation, economic action by either side, whether strike or lockout, would be considered by each of the parties as action against the entire group struck or locked out. However, for the purpose of furthering the demand for certain amendments to that contract, the members of the union, by group action, voted to strike. The selection of a certain plant or plants for a shutdown by strike at a particular time was a mere matter of strategy in the conduct of the trade dispute which equally involved all of the bakeries and their employees. This, in effect, applied the union's economic sanctions against each employer and brought about the unemployment of all of its members. Had the association acted first by closing down one of the member plants and the union followed with a strike against all of the remaining plants, it would be equally clear that the volitional act causing unemployment was the initial shutdown.

Either the union or an individual employer, at any time, could have broken off joint negotiations and bargained with its employees on an individual basis. But that course was not taken. At no time did the union purport to be directing any action solely against the Butter Cream plant; instead, the union continued throughout to deal directly with the association for the purpose of obtaining a new master contract. To say, therefore, that the act of striking the one plant did not shut down work in other plants of the association which were subject to the labor negotiations for the purpose of obtaining a master contract is wholly unrealistic. Industry-wide negotiations had been established by these employers and consistently carried on for over 10 years.

The volitional test established in *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935], was based upon the principle that innocent victims of a trade dispute should not suffer loss of their unemployment insurance rights. But the unemployment of the bakery workers was caused by their own action taken with full knowledge of its consequences. In the waffle shop case, the unemployment was due to a·lock-

out; here the lockout of the bakers was due to a strike. The lockout of the restaurant workers was attributed to the concerted action of the employers; the strike of the bakers was by the vote of all the employees concerned and was directed against all of the employers who were parties to the master contract. The volitional test itself is based upon a just analysis of a substantial subjective element and it cannot properly be extended or perverted by insistence upon mere form. In this case the union members knew from letters and statements as well as from prior strike action that any strike during negotiations would result in stoppage of all work. When, in the face of that information, union members authorized a strike, they placed themselves outside the class of persons who are properly protected by the subjective volitional exception to section 56 which was stated and applied in the Bodinson case.

The respondents rely heavily upon the following language of the waffle shop opinion: "A strike against a single member of an employers' collective bargaining unit involves economic action against that employer only and subjects to disqualification under the Unemployment Insurance Act those employees only who leave their work because of the dispute. If the other employers thereupon choose to close their establishments and lock out their employees, such employees cannot be charged with leaving their work because of a trade dispute." (24 Cal.2d 741.) But an important fact which must be considered in this connection is that the employer group involved in the waffle shop case was newly formed and had never been a bargaining agent for the restaurants; instead, the question of whether it should be the bargaining agent was one of the major issues in the dispute. The quoted language, therefore, is not applicable to a situation such as the present one where the evidence shows a long-standing practice of contracting between the union and a group of employers as a unit; if it may be said to have that effect it was dictum and, in either event, it is not here controlling.

A peremptory writ of mandate will therefore issue, requiring the director of the Department of Employment to remove from the official records the charges against the petitioners' accounts which are the subject of this proceeding.

Spence, J., concurred.

SCHAUER, J.—I concur both in the judgment and in the opinion of Justice Edmonds. Were it not for the majority

holding in *Bunny's Waffle Shop* v. *California Employment Com.* (1944), 24 Cal.2d 735 [151 P.2d 224], a different result might consistently be reached. It may be arguable that a simple and literal interpretation and application of section 56 (Unemployment Insurance Act) might be preferable to the volitional test first evolved in Bodinson[1] and then expanded in Bunny's case (*supra*). But to me the important thing, judicially, is not so much *how* we interpret section 56 as that, *having* interpreted it, we shall apply that interpretation fairly and consistently. I am satisfied that unless Bunny's case is to be squarely overruled no result other than that reached by Justice Edmonds can fairly and consistently be reached.

In Bunny's case there was no literal shutdown or lockout. A trade dispute had arisen; the employers, who theretofore had not, as among themselves, bargained collectively with the union (see p. 736 of 24 Cal.2d), demanded collective bargaining with their newly formed association (as stated at p. 737, they "wished to negotiate a single contract") and, as an alternative, announced that upon continued refusal to negotiate with their association wages would be reduced and certain working conditions changed. The employes refused to accede to either alternative and walked out.[2] But their walkout was

---

[1]*Bodinson Mfg. Co.* v. *California Emp. Com.* (1941), 17 Cal.2d 321, 327 [109 P.2d 935].

[2]As stated at page 738 of 24 Cal.2d, "[T]he employers submitted a proposed collective bargaining agreement to the Joint Board and offered to continue operations on the old terms pending negotiations. The unions rejected this proposal, reiterating their demand for individual agreements for more favorable conditions of work, and on that day directed employees of one of the restaurants to strike if the owner refused to sign such an agreement. The following day the restaurant owners' policy committee met and formulated a plan of action, and on July 3, 1941, the employers posted notices in their establishments that until the Joint Board and the unions agreed to negotiate collectively, wages would be reduced to 75 per cent of the previous rate, a six day week would replace the prevailing five day week, and split shifts instead of straight shifts would apply to all culinary workers. . . . [The commission] held that the employers' imposition of a split shift, a six-day week, a twenty-five per cent cut in wages, and a uniform pay-day, for the sole purpose of compelling the employees [p. 739] to bargain collectively with this group of employers was tantamount to a lockout, that the employees consequently left work as the result of the employers' acts and not voluntarily and that they were therefore not disqualified under section 56(a) of the act. . . . The commission's decision apparently is based upon the conclusion that the leaving of work was not voluntary, but [p. 740] it also found that the leaving was attributable to the employers' changes in wages and conditions of work, to continue in effect until the unions would negotiate with them. Petitioners do not question this finding but contend that their acts were but an additional step in a trade dispute, and that when claimants left their work

held not to be voluntary and the concerted act of the employers was held (see p. 739 of 24 Cal.2d) to be "tantamount to a lockout."

As shown more completely in the footnote quotation the commission held that "The economic weapon . . . was created by the employers . . . and it alone, rather than the trade dispute that occasioned it, was the cause of the leaving of work," and concerning that finding of the commission this court held that "[I]t rejects the trade dispute as the cause of such leaving and is sufficient to support the award of benefits."

Certainly in Bunny's case we should have been required to hold (on that phase of the case) that the employes had left their work voluntarily because of a trade dispute and, hence, were disqualified from benefits, unless we held, as the majority did, that it was proper to relate responsibility for the work stoppage to the party who created its actual and directly impelling cause. To that end the court looked behind the fact that literally there was no lockout or shutdown and that the employes could have continued at work either at reduced pay and different hours or, by agreeing to collective bargaining, at the old rates and conditions. In literality, the walkout there was, of course, due to a trade dispute, a sparring contest in which employers and employes were exchanging blows. The employers led with the collective bargaining or wage reduction-hour increase blow and the employes retaliated with the walkout punch. The court held that it was proper to examine into the trade dispute and necessary "to distinguish between leaving in the course of a trade dispute and leaving because of a trade dispute . . . There must . . . be a direct causal connection between the trade dispute and the leaving of work"; that there the leaving of work, while occurring *during* a trade dispute was *directly* caused by the

because of such acts, they left because of a trade dispute and are therefore not eligible for benefits. This reasoning fails to distinguish between leaving in the course of a trade dispute and leaving because of a trade dispute. The act does not disqualify an employee from receiving benefits in all cases where his unemployment results directly or indirectly from a labor dispute, but makes him ineligible only if he left his work because of the dispute. There must therefore be a direct causal connection between the trade dispute and the leaving of work . . . [p. 742] The economic weapon . . . was created by the employers and directed against their employees, and it alone, rather than the trade dispute that occasioned it, was the cause of the leaving of work . . . The finding of the commission as to the cause of claimant's leaving of work . . . was one that it was entitled to make under the facts. [Citation.] This finding rejects the trade dispute as the cause of such leaving and is sufficient to support the award of benefits."

act of the employers. In other words, the court related the leaving of work to the direct or proximately impelling cause, the concerted act of all employers directed against all employes; the court held accordingly that the employers were responsible and that the employes had not left voluntarily because of the trade dispute.

Here the similarity to Bunny's case is patent, but reversed as to parties. In this case, the employes struck the first, the impelling blow. The retaliation by the employers was exactly what the employes expected when they struck and was directly responsive to their action. In Bunny's case it was, of course, true, in literality, that the employes had a choice in the solution of which they exercised discretion. But it was not a free choice; they had to yield something in either alternative submitted by the employers. Hence, their walkout was not voluntary; the situation requiring the choice and necessitating some concession was created by the employers and their attempt was to force that choice on the employes. Here, it is rationally inescapable, we have exactly the same situation but in reverse.

The employes and the employers, in the case before us, were, and long had been, parties to one master contract which set forth the terms and conditions binding on all employes and all employers. Although only the employes of Butter Cream Baking Company literally walked out, that strike in principle and in its object was directed against all of the employers who were members of the association as much as against Butter Cream. The vote of the employes did not merely authorize a strike against Butter Cream; it authorized the strike against any or all of the employers as the union strategists might from time to time determine was expedient to the end of attaining the master contract modifications demanded by the union and which, if made, would be applicable to all employers; the union knew that a strike against one would be treated as a strike against all and they intended that the strike should be effective in obtaining concessions from all the employers, not just from Butter Cream.

Certainly here the employers (as did the *employes* in Bunny's case) had a choice which involved the exercise of discretion. They could accede to the demand of the union for the changes in the master contract or they could relinquish the joint participation in collective bargaining which the master contract obviously called for, and permit their plants to be struck one by one or in groups, until separate

contracts were executed, or they could close all plants on a walkout from one. But this was not a free choice any more than the choice of the employes in Bunny's case was a free choice. In either alternative submitted by the union the employers were required to yield something. Clearly, if Bunny's case is to be followed, the employers, already having a master contract, did not have to accept either of the alternatives offered to them. They had a master contract; they had specifically notified the union that a strike against one would be treated as a strike against all; they did exactly that and that, exactly, is what the union expected when the strike was called.

It is asserted in support of respondents' position that "[A]lthough the union knew that the employers had an understanding among themselves that 'they would act as a unit in collective bargaining matters . . .,' the understanding was entirely unilateral upon the part of the employers, and the union never indicated that it would accept or be bound by it." It is as difficult for me to square that factual statement with any rational view of the facts depicted by the record as it is to reconcile the legal position of the dissenters with the holding in Bunny's case. The record shows unequivocally that the employers' association was organized in 1935 for the express purpose of representing its members and acting as a unit for them in collective bargaining with the employes, that continuously from that time on the association *has* represented its members in such collective bargaining with the union and that, quite to the contrary of being "entirely unilateral upon the part of the employers" and never recognized by the union, the fact is that from 1935 on *the union did accept* the employers' association as the bargaining unit and its contracts were made with that association. In fact the very master contract in question, to secure changes in which the strike was authorized and called, is a collective bargaining contract to which the union and the association were the contracting parties and in which contract the members of the association (likewise the members of the union) acted as a unit.

The position of the dissent of the Chief Justice appears to be grounded upon a few sentences selected from the record and construed as disassociated from their context. If these selected sentences could be said to create a material conflict in evidence then we would have a different situation. But no such case is here. Since we have stipulated facts before us

I find no justification for ignoring some of those stipulated facts in order to ascribe a meaning to certain statements, which meaning is untenable if the ignored facts are given effect. The statements in the record particularly relied on for the dissenting position are as follows: "The members of the Association (employers) understood among themselves that they would act as a unit in collective bargaining, and that a strike against any one or more members would be treated by them as a strike against all. This position had been known to the union by statements, letters and prior action . . . but the union at no time expressed either agreement or disagreement with this position . . . At a meeting at the premises of the struck bakery . . . called within an hour after a picket line was established, a representative of the employers stated to a union representative that the strike against one employer would be treated as a strike against them all, to which the union representative replied that he expected such result."

Apparently on the strength of the last quoted language it is asserted that "the understanding [of the employers that "they would act as a unit in collective bargaining matters, and that a strike against any one or more members would be treated by them as a strike against all"] was entirely unilateral·upon the part of the employers." But it seems to me that a fair representation of the record requires that the foregoing sentences be read and understood in the light of the fact that the stipulation of facts also states that "the individual members of the union . . . authorized its negotiating committee to call a strike against *any one or more* of the employers in the committee's discretion . . . and this committee was authorized by the membership to conduct negotiations and *do whatever was necessary* to advance the progress of negotiations as that committee deemed best, and to call a strike, if that was necessary, *at any plant or plants* of the employers decided upon by the committee . . ." (Italics added.) Furthermore, it seems to me to be established beyond question on this record that the strike was directed against all the employers because admittedly there was but one contract by which all employes and all employers were bound; the demand of the union was for amendments to that one master contract affecting all employers; the strike vote authorized the union's committee to "do whatever was necessary to advance the progress of negotiations" for the amendments demanded and, to that end, to shut down "any plant

or plants of the employers decided upon by the committee."

In my view the designation of the statement, "the members of the Association understood among themselves that they would act as a unit in collective bargaining" etc., as a "unilateral agreement" is, in the light of the other stipulated facts, unfair and inaccurate. Certainly the members of the association understood "among themselves" that "they would act as a unit in collective bargaining." But so did the union understand that fact. In truth the union's negotiations were conducted with the employers' association as a unit and it was concerning a contract which had been executed by the association as a bargaining unit and by the union as a bargaining unit that the negotiations were conducted; and, as stated in the stipulation, "The union's sole demand was for changes in the contract with the Association. At no time during negotiations were demands made upon the individual employers either before or after the picket line was established."

Lastly, it is noted that the dissent of the Chief Justice places reliance on a quotation from Bunny's case (p. 741 of 24 Cal.2d) : "A strike against a single member of an employers' collective bargaining unit involves economic action against that employer only and subjects to disqualification under the Unemployment Insurance Act those employees only who leave their work because of the dispute. If the other employers thereupon choose to close their establishments and lock out their employees, such employees cannot be charged with leaving their work because of a trade dispute. The threat of possible economic action involved in a strike upon one of a group of employers . . . bears no analogy to the employers' act in the present case, for the latter culminated in actual economic action against the employees that caused them to leave their work."

The fallacy of such reliance is obvious. The statement quoted must be either a dictum which is grossly contrary to the actual holding of Bunny's case, or it is distinguishable and, in implication, supportive of Justice Edmonds' conclusions. Surely, it was not intended to suggest a "heads I win-tails you lose" application of the rule dependent on an interchange of the positions of the parties to the dispute. Examining the quotation for its true significance I think this appears: At the very outset its language is that "A strike against a single member of an employers' collective bargaining unit," etc. But here we do not have a *strike against a*

*single member*; the strike was directed against *all* the members—"to advance the progress of negotiations" for amendments to the one master contract—although at the moment a walkout had been called in one plant only. That call was but a matter of strategy, deemed most expeditious to attain the end against all. Thus the major premise of the entire statement falls as to this case.

Secondly, the quotation reads, "The threat of possible economic action involved in a strike upon one of a group of employers . . . bears no analogy to the employers' act in the present [Bunny's] case, for the latter culminated in actual economic action against the employees that caused them to leave their work." Here it was the "actual economic action" of the *employes against the employers* which "caused them" (the employers) to shut down the plants.

Since we have in Bodinson, and as expanded in Bunny's case, declared the volitional-direct cause test, and since the undisputed facts here do not disclose any material distinguishing feature, adherence to sound judicial process requires that we apply that test. If in Bunny's case the walkout was involuntary and directly caused by the concerted act of the employers it is at least equally clear that here the shutdown by the employers was involuntary and the work stoppage was directly caused by the strike vote and action of the employes. Their strike vote and call were voluntary and directly resulted, as was expected, in the shutdown. The *free* choice here was that of the employes, not of the employers. The writ must issue, as directed.

Shenk, J., concurred.

GIBSON, C. J.—I dissent. The record in this case clearly shows that petitioners locked out their employees, and it is impossible for me to understand how it can be said that the employees left their work within the meaning of section 56 of the Unemployment Insurance Act. That section, as amended in 1945, provides: "An individual is not eligible for benefits for unemployment, and no such benefit shall be payable to him under any of the following conditions: (a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed." (Stats. 1945, ch. 1178, p. 2225; 3 Deering's Gen. Laws, 1945 Pocket Supp., Act 8780d, § 56.)

It is conceded that the right to benefits depends upon whether the worker left his job of his own free will or was *forced* to do so because of the acts of others and that under the Bodinson case section 56 disqualifies only those workers who *voluntarily* leave their work. (*Bodinson Mfg. Co. v. California Emp. Com.,* 17 Cal.2d 321, 327 [109 P.2d 935].) Thus, although the section clearly precludes the payment of benefits to employees who go out on strike (*American-Hawaiian S. S. Co. v. California Emp. Com.,* 24 Cal.2d 716 [151 P.2d 213] ; *W. R. Grace & Co. v. California Emp. Com.,* 24 Cal.2d 720 [151 P.2d 215] ; *Bodinson Mfg. Co. v. California Emp. Com., supra),* it has been treated as not generally disqualifying workers who are locked out by their employers. (See *Bunny's Waffle Shop v. California Emp. Com.,* 24 Cal.2d 735, 741 [151 P.2d 224] ; *Bodinson Mfg. Co. v. California Emp. Com., supra,* at p. 327.) It would be a contradiction in terms to hold that a locked-out employee had *voluntarily* left his work.

Here it clearly appears from the agreed statement of facts that after the strike was called against one member of the employers' association, the bakery workers employed by petitioners remained at their jobs until petitioners closed down their plants and that petitioners' employees were willing to continue working throughout the course of the strike. Ordinarily it would be expected that this would end the matter, establishing that the employees had not voluntarily left but, rather, had been forced to leave their work.

The majority opinion, however, concludes that the employees "left their work voluntarily and, therefore, should have been excluded from receiving unemployment benefits." The theory seems to be that because the union and the employers' association were negotiating with regard to proposed changes in the master contract, and because the union had been informed of an understanding or agreement solely among the employers that a strike against one of them would be treated as a strike against all, the members of the union, by permitting a strike against one employer, thereby "placed themselves outside the class of persons who are properly protected by the subjective volitional exception to section 56 which was stated and applied in the Bodinson case." In my opinion this theory is unsound and does not warrant the conclusion that petitioners' employees voluntarily left their work.

Before considering the questions of law raised herein, it

should be noted that certain statements in the majority opinion may create a misapprehension of the true nature of the facts presented by the record. It is stated as a fact or inferred that the union was aware that "under such industry-wide, single contract negotiation, economic action by either side, whether strike or lockout, would be considered by each of the parties as action against the entire group struck or locked out." There is nothing in the agreed statement of facts to the effect that the *union* might strike all remaining plants if the *association* first closed down one or more plants. Further, although the union knew that the employers had an understanding among themselves that "they would act as a unit in collective bargaining matters, and that a strike against any one or more members would be treated by them as a strike against all," the understanding was entirely unilateral upon the part of the employers, and the union never indicated that it would accept or be bound by it.

It is also stated as a fact in the majority opinion that "In this case the union members knew from letters and statements as well as from prior strike action that any strike during negotiations *would result in stoppage of all work.*" [Italics added.] The italicized portion goes beyond the agreed statement of facts submitted by the parties, which shows only that the union knew that a strike against one "would be treated by [the employers] as a strike against all." It does not follow that the union was aware that the understanding necessarily included an agreement to invoke a lockout or shutdown, since there is other conduct, short of a lockout, which might constitute treating the strike against one as a strike against all. For example, it might have been intended that the remaining employers would publish statements in the newspapers declaring that there was in effect a strike against all, or the employers might have contemplated financial aid to the one struck establishment or assistance in obtaining nonunion labor to reopen that plant or to meet any need for additional workers in their own plants. The understanding might also mean that the employers considered that a strike against all of them, although without a lockout or shutdown, would be a talking point or special matter for discussion during the collective bargaining negotiations.

Although it might be possible to infer that the notification to the union of the understanding among the employers included a threat to close the plants, it does not seem proper to draw such an inference under the circumstances of this

case. Petitioners in this mandamus proceeding of course have the burden of proving all facts upon which they rely, and in their pleadings they claimed that the union was aware of such an understanding as is assumed by the majority opinion. The petition alleges that the members of the union knew that "any action" against one employer "would be considered and treated by the said Association as strike action against all, and that all of the establishments would be closed if a strike was called against one or more, but not all," and it is also alleged that the bakery employees acted with "full knowledge that the said action would bring about the closing of the plants of petitioners herein." These allegations, however, were denied by the return to the writ. The dispute as to the facts was resolved, at the request of this court, by the agreed statement of facts filed herein, and in view of the pleadings it seems apparent that the language used in the agreed statement was a deliberate modification of or departure from the broader allegations of the petition.

Even if it be assumed that the union knew of an understanding among the employers that, upon a strike against one, the remaining employers would close their plants, this fact is not controlling. The understanding, as we have seen, was not in any way acceded to or binding upon the employees, but was entirely unilateral, among the employers only, and it seems erroneous to rely upon the fact that the union had been informed of the understanding and of the employers' intended course of action. It would broaden the disqualification provisions of the statute to permit employers to escape liability for unemployment due to what would otherwise be classed as a lockout merely by adopting the device of entering into such a unilateral agreement in anticipation of a strike against one employer and then notifying their employees of the agreement. If petitioners would have been chargeable with a lockout had the agreement to close down their plants not been made until after the strike was called against Butter Cream Baking Company, they should likewise be held responsible here. We need not determine whether the understanding would be of importance if it had been made part of the collective bargaining contract, because the union never agreed to be bound by it and, therefore, should not be charged with having improperly disregarded it. Clearly the employers should not be able to defeat any right of the union to act as it did merely by giving notice of the agreement made among

themselves that they would not recognize a strike as being limited to one employer.

Although the employees authorized the negotiating committee of the union to call a strike against "any one or more of the employers in the committee's discretion," the agreed statement of facts clearly shows that the "union declared a strike against . . . one of the members of the Association." The fact that the authorization first given was broader than the strike eventually declared is, of course, immaterial, since it did not, of itself, constitute action directed against the employers.

The only real issue in this case, therefore, is whether, regardless of knowledge of the unilateral understanding, petitioners' employees were chargeable with having voluntarily left their work in petitioners' establishments by virtue of the fact that, during the course of negotiations for changes in the industry-wide contract, they, as union members, authorized a strike which was called against only one of several employers as a means of publicizing the dispute. The majority of the court, however, do not make it clear whether they would reach the same result if the factor of knowledge of the understanding were not regarded as a ground for their holding. In my opinion the activity in which petitioners' employees engaged did not constitute conduct which should be treated as such a direct cause of the shutdown that it was tantamount to a voluntary leaving of work. Although the strike at Butter Cream Baking Company may have induced petitioners to close their plants, there is no contention that operation of the plants actually became impossible because of the strike, and there is nothing to show that any property or business would have been injured by continuation of operations. The only reason given by petitioners for the shutdown is that it was put into effect as an economic weapon on the part of the employers to counteract the tendency that the strike against one bakery might have to break up the united stand adopted by the members of the association.

Even if we assume that petitioners are correct in attributing the strike against the Butter Cream Baking Company to a plan or scheme to force the employers to yield one at a time to the demands made in the labor dispute,* the strike did not

---

*The agreed statement of facts does not contain the reason why the union called the strike against only one employer, but at the hearing before the referee a representative of the union testified that it was because "we felt that we couldn't take all the bakeries on together."

compel petitioners to take such a drastic step as locking the doors, and, for the purposes of section 56, it should not excuse petitioners' responsibility for their conduct. A lockout to protect the united stand of a group of employers is, in principle, no different from any other lockout deliberately used by an employer as a weapon to serve his purposes during the course of a labor dispute. This is not meant to suggest that the employers were not free to take such a step but merely that if they did so they, and not their employees, should be required to bear full responsibility for the stopping of operations, insofar as the Unemployment Insurance Act is concerned, and there is no sound basis for holding that the employees in effect voluntarily left their work.

The majority opinion apparently concedes that the members of the union could call a strike against only one employer without being subject to a charge of having voluntarily left work in petitioners' establishments by merely going through the formality of withdrawing from negotiations with the association and, instead, bargaining with each employer separately. It is stated that "either the union or an individual employer, at any time, could have broken off joint negotiations and bargained with its employees on an individual basis. But that course was not taken." If this is all that is required of a union as a prerequisite to conducting a strike against only one employer without disqualification under section 56 of those of its members who work for the remaining employers, the rule adopted by the majority is simply one of form and not of substance, because a union need merely announce at the conference table that it is henceforth negotiating with each employer as an individual rather than as a member of the association. Further, there is nothing to indicate that the employers in the present case were in any manner injured or misled by the union's failure to take such a step, and to hold that compensation was improperly awarded here solely because the union did not follow the suggested procedure seems clearly unjustified.

Moreover, the conclusion reached by the majority is contrary to *Bunny's Waffle Shop* v. *California Emp. Com.*, 24 Cal.2d 735 [151 P.2d 224]. In that case restaurant employees, during the course of a labor dispute, refused to bargain collectively with an employers' association and insisted upon dealing individually with each employer. The employers made

a 25 per cent cut in wages and a change in working shifts solely for the purpose of compelling the employees to bargain with the association, and the employees thereupon left their work. It was held that the cause of the employees' leaving work was not the trade dispute but the cut in wages and the change in shifts which were unrelated to, though motivated by, the demands made in the dispute. The court concluded, therefore, that the employees were not disqualified under section 56 since they had not left their work "because of a trade dispute." The employers in that case had argued that the wage cut and the change in shifts were merely steps in the course of a labor dispute and were similar to the act of a union in striking against an individual member of an employers' association. The court, however, using language directly in point here, distinguished the two types of acts (24 Cal.2d at page 741) : "A strike against a single member of an employers' collective bargaining unit involves economic action against that employer only and subjects to disqualification under the Unemployment Insurance Act those employees only who leave their work because of the dispute. If the other employers thereupon choose to close their establishments and lock out their employees, such employees cannot be charged with leaving their work because of a trade dispute. The threat of possible economic action involved in a strike upon one of a group of employers . . . bears no analogy to the employers' act in the present case, for the latter culminated in actual economic action against the employees that caused them to leave their work." It is apparent that the statement is not dictum, as claimed by petitioners, since it was the answer given by the court to the point raised.

The argument that the result reached by the majority is required, or even suggested, by the Bunny's Waffle Shop case is without foundation, for at least two major reasons. The majority apparently assume that the Bunny's case held that the employees there involved did not *voluntarily* leave work and that the wage cut and the change in work shifts were tantamount to a lockout and in effect compelled the employees to leave work. They say, speaking of the Bunny's case, that "although the employees left work of their own choice, that choice was not freely made but was *compelled* by the economic weapon which the employers used." [Italics added.] Although not made entirely clear, the majority opinion then seems to reason that under this rule, applied by analogy to the present case, the strike against Butter Cream Baking

Company *compelled* the remaining employers to close down in the same manner that the wage cut in the Bunny's case compelled the restaurant workers to leave. From this it is concluded that petitioners did not voluntarily lock out their employees but, rather, that the employees, in effect, voluntarily left their work.

First, the assumption that the Bunny's case treated the employees as not having voluntarily left work is erroneous. The opinion in that case makes it perfectly clear that, although the *commission* had relied upon the theory that the wage cut amounted to a lockout, compelling the employees to leave, the court adopted an entirely different ground for concluding that the disqualification of section 56 was not applicable. (See 24 Cal.2d at pp. 739-742.) The court held that section 56 did not apply because there was no "direct causal connection" between the leaving of work and the trade dispute, within the meaning of that portion of the statute disqualifying employees only when they leave "because of a trade dispute." As stated at page 741 of 24 Cal.2d, the employees in the Bunny's case "left because of this economic weapon and not because of the trade dispute then in existence. The fact that the trade dispute was unquestionably the motivating cause of the employers' acts does not establish any direct causal relation between the dispute and the employees' leaving of work." Thus, although it is possible that the same result could have been reached in the Bunny's case upon the theory now attributed to it by the majority herein, the decision was specifically placed upon a different ground.

The opinion in the Bunny's case indicates that the court really treated the employees as having voluntarily left work. At page 742-743 of 24 Cal.2d the court found it necessary to determine whether, *"if they left their work voluntarily,* they are subject to the temporary disqualification imposed by section 58(a) of the act upon one who 'left his most recent work voluntarily without good cause . . .,' " and it was held that there was "good cause" within the meaning of section 58(a). [Italics added.] It is obvious that section 58(a) would not have required any discussion at all if, as the majority opinion now states, the ruling with respect to section 56 had been placed upon the theory that the leaving was not voluntary.

Second, even assuming that the Bunny's case held that a 25 per cent wage cut is tantamount to a lockout and therefore compels the employees to leave, and, further, that the case, by analogy, would support a rule that employees will be

chargeable with having voluntarily left work if they engage in conduct which, similarly, *compels* their employers to lock them out, it still does not follow that a strike against one employer is sufficient to compel lockouts by the remaining employers involved in the trade dispute. Although it is understandable that a 25 per cent wage cut, or, for example, a 50 or 75 per cent cut, could reduce the income of a worker to such an extent that he would actually be forced to seek a different job in order to survive, the situation of a worker whose wages have been so reduced is not at all comparable to that of the petitioners here. These employers were in no way compelled or forced to lock their doors to protect their plants or businesses, and the purpose of the lockout was simply to give them an added advantage in bargaining with the union. The strike was directed only against the Butter Cream Baking Company, and petitioners were not subjected to strike, or threat to strike, or any other activity which would have forced them to close down. The most that can be claimed is that petitioners were subjected to indirect pressure resulting from a strike against a *different* employer at a *different* establishment which might place them at some disadvantage in negotiations. Such activity upon the part of the union cannot reasonably be treated as sufficient to justify the drastic step of a lockout any more than could the conduct of the union in the Bunny's case justify the action of the employers in imposing the 25 per cent wage cut, insofar as fixing responsibility for unemployment insurance is concerned.

Finally, the determination that the accounts of petitioners should not be chargeable with benefits paid to their employees amounts to disregarding the differences between the California statute and those adopted elsewhere. The California law is unique, since the labor dispute qualification found in section 56, based solely on a voluntary leaving of work, does not appear in the unemployment insurance acts of any other jurisdiction today.* Statutes in a large majority of the other

---

*At least two states, Wisconsin and Pennsylvania, once had statutes similar to section 56, but they were subsequently revised to adopt provisions similar to those prevailing in a majority of the states. (See C.C.H. Unemployment Insurance Service: Pa., par. 4102; Wis., par. 4034A.) Eight jurisdictions have expressly mentioned lockouts in the disqualification provisions of their unemployment insurance acts. Of these, three provide for automatic disqualification of locked out employees (see C.C.H. Unemployment Insurance Service: Ariz., par. 4034; Dist. of Col., par. 4029A; N.Y., par. 4108), four provide that there is no disqualification (see C.C.H. Unemployment Insurance Service: Ky., par. 4036; Ohio, par. 4030; Minn., par. 4051; W. Va., par. 4099), and one

states were modeled after the English unemployment insurance laws and the federal Social Security Board Draft Bill, and they provide that an employee is disqualified from receiving benefits if his unemployment is due to a stoppage of work existing because of a labor dispute and he either participates in or is interested in the dispute or belongs to a class of workers who are participating in the dispute.† Such statutes operate not only to disqualify employees who would be ineligible under the California law but, in addition, bar many individuals who do not voluntarily leave their work.‡

It is clear that at the time the California Unemployment Insurance Act was adopted, the Legislature was familiar with both the type of labor dispute disqualification based upon the voluntary act of the individual worker and the type of provision now enacted in most other states. When the Cali-

---

provides that there is no disqualification if the lockout is unjustified. (See C.C.H. Unemployment Insurance Service: Miss., par. 4011.) Two other jurisdictions may provide for no disqualification in the event of a lockout. (See C.C.H. Unemployment Service: Colo., par. 4010; Utah, par. 4015.)

†About 26 states have provisions of this type. (See C.C.H. Unemployment Insurance Service: Ark., par. 4042; Ga., par. 4010; Idaho, par. 4066; Ill., par. 4031; Ind., par. 4071; Iowa, par. 4014; Kan., par. 4028; Maine, par. 4013; Md., par. 4016; Mass., par. 4056; Mich., par. 4041; Mo., par. 4048; Mont., par. 4009; Neb., par. 4052; N.H., par. 4028; N.J. par. 4012; N.M., par. 4009; N.C., par. 4072; N.D. par. 4102; Okla., par. 4009; Pa., par. 4102; S.D., par. 4061; Tex., par. 4018; Va., par. 4029; Wash., par. 4077; Wyo., par. 4027.)

Twelve states have statutes which contain somewhat different language but are generally the same in that disqualification is not dependent on whether the employee is voluntarily or involuntarily unemployed. (See C.C.H. Unemployment Insurance Service: Ala., par. 4034; Conn., par. 4028; Del., par. 4027; Fla., par. 4032; La., par. 4008; Nev., par. 4028; Ore., par. 4025; R.I., par. 4044; S.C., par. 4010; Tenn., par. 4034; Vt., par. 4071; Wis., par. 4034A.)

For an analysis and classification of the various provisions see Fierst and Spector, Unemployment Compensation in Labor Disputes [1940] 49 Yale L.J. 461; Lesser, Labor Disputes and Unemployment Compensation [1945] 60 Yale L.J. 167; note [1949] 49 Columb.L.Rev. 550.

‡For example, participants in a labor dispute who were locked out by their employers have been held not entitled to benefits. (*In re North River Logging Co.*, 15 Wn.2d 204 [130 P.2d 64, 66]; *Adkins* v. *Indiana Employment Security Division*, 117 Ind.App. 132 [70 N.E.2d 31, 34-35]; see *Fash* v. *Gordon*, 398 Ill. 210 [75 N.E.2d 294, 297].) The courts have also ruled that employees who were laid off because of a strike, but who did not join in the strike were disqualified, regardless of their conduct or sympathies, if some of the workers of their class or grade went on strike. (*Auker* v. *Review Board*, 117 Ind.App. 486 [70 N.E.2d 29, 71 N.E.2d 629]; *Unemployment Compensation Com.* v. *Martin*, 228 N.C. 277 [45 S.E.2d 385]; *Members of Iron Workers Union* v. *Industrial Com.*, 104 Utah 242 [139 P.2d 208]; *In re Deep River Timber Co.'s Employees*, 8 Wn.2d 179 [111 P.2d 575].)

fornia unemployment insurance bill was first introduced in January, 1935, only the State of Wisconsin had passed an unemployment insurance act, and under that statute as it then existed an employee was ineligible for benefits ''during any period for which he has left and is out of employment because of a trade dispute still in active progress in the establishment in which he was employed.'' (Wis.Stat. [1931 Sp. Sess.] ch. 20, § 108.04(5) c.; subsequently amended by Wis. Stat. [1935] ch. 192, § 4, p. 292.) The legislators who proposed the California bill knew of the provisions of the original Wisconsin statute and also of the English legislation which disqualified an employee ''who has lost employment by reason of a stoppage of work which was due to a trade dispute.'' (1935 Assembly J., vol. 1, p. 101; Unemployment Insurance Act of 1920, 10 & 11 Geo.V. ch. 30(8); see 14 & 15 Geo.V. ch. 30(4).) The language adopted by the Legislature in section 56 is almost identical with that of the former Wisconsin provision. We must assume, therefore, that the Legislature deliberately selected a disqualification provision based on voluntary action by the individual employee and rejected the broader type of disqualification found in the English legislation. The conclusion reached by the majority of this court, however, fails to give full recognition to the fact that our statute is not like those in most of the states, and it improperly increases the scope of the disqualification provision beyond its plain and reasonable meaning.

The only case we have been able to find which dealt with a situation similar to that involved here held that the employees, comparable to petitioners' employees, were in fact locked out and were therefore entitled to unemployment insurance. (*Bucko* v. *J. F. Quest Foundry Co.*, Minn.Supr.Ct., June 24, 1949, 18 U.S. Law Week 2011.) The statute there considered is different from ours in that it disqualifies an employee who has left or lost his employment because of a strike or other labor dispute and then provides that nothing in the provision ''shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout.'' The court stated that under this statute the ''fault which governs is the ultimate and final act causing the unemployment rather than any preliminary act which might furnish a motive for a lockout causing the unemployment.'' It also said that by so construing the statute it gives ''meaning to the present statutory provision excepting from disqualification unemployment due to a lockout, without doing violence to the legislative

declaration of public policy limiting the right to benefits of unemployment due to no fault of the employee.''

It is not the province of this court to consider either the merits of the trade dispute underlying the stoppage of work or the social desirability of paying benefits to petitioners' employees. (See *W. R. Grace & Co.* v. *California Emp. Com.*, 24 Cal.2d 720, 731 [151 P.2d 215]; *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321, 325 [109 P.2d 935].) There is nothing in section 56 or any other portion of the Unemployment Insurance Act which would justify a denial of benefits here, and the possibility that the allowance of benefits in a case such as this may furnish some members of a union with funds which could be used to help finance a labor dispute is plainly a matter which only the Legislature may consider.

The alternative writ of mandate should be discharged and the application for a peremptory writ denied.

Traynor, J., concurred.

CARTER, J., Dissenting.—As I understand the position taken by the majority in this case, it is to the effect that where an industry-wide collective bargaining agreement exists between employers and a labor union and there is an understanding between the employers that if a strike is called against one of their group the others will close their plants, the employees who are locked out as a result of such closing cannot obtain unemployment compensation benefits, and that if in such a situation one employer closes his plant, the union may declare a strike against all of the other employers, and all of the employees thrown out of employment as a result of such action are entitled to unemployment compensation benefits. I do not believe that it was the intention of the Legislature that the Unemployment Insurance Act should be so construed. Neither do I believe that anything said in *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935], or in *Bunny's Waffle Shop* v. *California Emp. Com.*, 24 Cal.2d 735 [151 P.2d 224], requires such an interpretation of the Unemployment Insurance Act. It strikes me that the interpretation placed on this act by the majority in this case is just a step toward the ultimate holding that an over-all employers' association which unites industry of the community or state for the purpose of dealing with labor problems could make it impossible for any employee who belongs to a union to obtain unemployment insurance benefits

by closing all industry in the event of a strike against any member of the group comprising the over-all employer organization. In other words, in order for an organized employer group to exert economic pressure to prevent a strike against one of their group, a complete shutdown or lockout could be inaugurated with the result that none of the employees locked out and thereby involuntarily unemployed could receive unemployment compensation benefits.

I cannot believe that it was the intention of the Legislature, in enacting section 56 of the Unemployment Insurance Act, to disqualify from unemployment insurance benefits any employees except those who actually leave their work because of a trade dispute between them and their employer. This is what the act provides, and to extend it further by judicial interpretation, is, to my mind, nothing more or less than judicial legislation. I would deny the writ prayed for in this case.

Respondents' petition for a rehearing was denied October 13, 1949. Gibson, C. J., Carter, J., and Traynor, J., voted for a rehearing.