[Civ. No. 25134. Second Dist., Div. One. July 27, 1961.]

YELLOW CAB COMPANY (a Corporation), Respondent, v. CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD et al., Appellants.

344

Stanley Mosk, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Appellants.

Lawrence A. Merryman for Respondent.

LILLIE, J.—Frank Seipp, Jr., worked for respondent Yellow Cab Company between September 26, 1956, and October 7, 1956; thereafter he obtained employment elsewhere and as a result of its termination was awarded unemployment insurance benefits effective May 12, 1957. Inasmuch as respondent was a base-period employer (Seipp's base period was January through December 1956), the Department of Employment charged its account with a portion of the benefits granted Seipp; however, under section 1032 of the Unemployment Insurance Code, respondent can relieve its reserve account of such charges if it can prove either that Seipp "left the employer's [respondent] employ voluntarily and without good cause or was discharged by reason of misconduct in connection with his work." Thus on June 6, 1957, it requested the department to make a ruling on the termination of Seipp from its employment; the department ruled that he had left respondent's employ with good cause and that the charges to its reserve account must stand. Respondent appealed to the referee, who reversed the ruling. On its own motion the

Unemployment Insurance Appeals Board set aside the decision of the referee; held that Seipp was not discharged but voluntarily left respondent's employ and that there was no prima facie showing he left without good cause; and affirmed the decision of the department. Thereafter respondent filed a petition for writ of mandamus to review the decision of the board. The lower court found that Seipp "was discharged by petitioner and did not voluntarily quit" (Findings of Fact, par. 5), and concluded that respondent "made a prima facie case that Frank Seipp was discharged" (Conclusions of Law, par. 4) and that his "action in failing to return to work without leave of absence having been given him was misconduct" (par. 5); granted the writ; and ordered the board to set aside its decision. From this judgment the board appeals.

The record reveals the following undisputed facts. Seipp began working for respondent as a cab driver on September 26, 1956; he was given a set of "Operating Regulations" which in pertinent part provided: "Should you be sick or for any valid reason unable to report for work, notify your garage superintendent not less than two hours before the time you are due out. . . . Any driver who is absent without leave for seven days will be terminated. Any day off not okayed by the garage superintendent will be counted as AWOL time." Seipp worked for 11 days; on the 12th day, October 7, 1956, without notifying respondent or giving any reason therefor, he failed to report for work; he did not communicate with respondent then or at any time thereafter and never advised it of his reason for failing to report. His pay for the 11 days' work from September 26, 1956, to October 7, 1956, amounted to $56.70; after October 6 Seipp obtained employment elsewhere; he at no time ever sought reinstatement with respondent. Seipp having failed to report for work on October 7, respondent held his time card for seven working days at the end of which, pursuant to its regulations, it marked the same as a "discharge" for an unauthorized absence from work; respondent never notified Seipp of this action.

Seipp was not present at the hearing; respondent neither subpoenaed him to appear nor took his deposition; it did not request the department to obtain information from its records concerning Seipp's employment after leaving respondent; and it presented no evidence of its working conditions or salary scale or how many hours Seipp worked during the 11 days.

The parties agree, under *California Portland Cement Co. v. California Unemp. Ins. Appeals Board,* 178 Cal.App.2d 263 [3 Cal.Rptr. 37], that the burden is on respondent to produce evidence which would establish a prima facie case that Seipp was "discharged by reason of misconduct in connection with his work." However, respondent denies that it has any additional burden of proving the negative fact that Seipp did "not quit" (R.O.B., p. 4), under the first alternative of section 1032, arguing that it is neither in accord with the disjunctive wording of the statute nor compatible with the intent and policy of unemployment benefit legislation to require it to prove both propositions under section 1032— that Seipp left its employ "voluntarily and without good cause" *and* that he was "discharged by reason of misconduct in connection with his work." The record shows that respondent has not sought relief under the first alternative, but has elected to proceed only under the second; thus, it contended before the board that Seipp "was discharged for reasons constituting misconduct in connection with his work" (Ruling Decision No. 121, p. 2), and the board defined the issues accordingly. However, implicit in the board's holding that Seipp "voluntarily left the employer's employ" (p. 4) is the finding that respondent did not sustain its burden of proving that he was discharged. Thus, since it is conceded by respondent "that there is no sufficient evidence in the record to show that Seipp did not have good cause for quitting, if it is found that he quit" (R.O.B., p. 13), we are in accord with respondent's view that the only matter before us is whether it has sustained its burden of proving that Seipp was discharged by reason of misconduct connected with his work, under the second alternative set forth in section 1032.

We know of no California case wherein the second proposition has been discussed; thus we draw on the court's opinion in *California Portland Cement Co. v. California Unemp. Ins. Appeals Board,* 178 Cal.App.2d 263 [3 Cal.Rptr. 37], construing the first alternative under section 1032. Therein the petitioner (employer) offered proof that Carter quit his job stating he was leaving to obtain other work, and that Carter left for a cause not attributable to the company. The court held this insufficient to establish a prima facie case under section 1032, in that the employer did not prove that Carter did not have a compelling personal reason to quit. In discussing the scope of appellate review and what constitutes a prima facie

showing, the court said at page 269: "In reviewing a decision of the trial court, the reviewing court, on facts such as these, determines only whether the decision is supported by the record. (*Ashdown* v. *State of Calif. Dept. of Emp.*, 135 Cal. App.2d 291, 299 [287 P.2d 176].)　　The inquiry is one of law: whether, on the undisputed facts, petitioner made a prima facie showing that Carter left his employment with petitioner voluntarily and without good cause. (4 Cal.Jur.2d 488, § 606; *Haynes* v. *Unemployment Comp. Com.*, 353 Mo. 540 [183 S.W.2d 77, 80].)''; and again at page 274: "Petitioner argues that it made a prima facie case that Carter left his employment without good cause by circumstantial evidence; that the fact is necessarily inferable from the evidence it produced. . . . We cannot say, as a matter of law, that the only inference deducible from the evidence is that Carter quit without good cause.''　　As to what constitutes a prima facie case the court pointed out at page 274: "A prima facie showing requires proof of facts from which a legal conclusion can be drawn. The determination whether an employee left his employment 'without good cause' is, in effect, the drawing of a legal conclusion from a set of facts. 'Good cause' cannot be determined in the abstract any more than can any other legal conclusion. It can be determined only in relation to a set of facts.''

　　Bearing in mind the burden of proof under section 1032, and that "[t]he employer assumes the risk of nonpersuasion'' (*California Portland Cement Co.* v. *California Unemp. Ins. Appeals Board*, 178 Cal.App.2d 263, 268 [3 Cal. Rptr. 37]), to prevail, respondent must not only establish that Seipp was discharged but that his discharge was by reason of misconduct in connection with his work. Thus mere proof that it marked his time card as a "discharge'' is not sufficient; it must also prove that this act, in substance and in fact, constituted a termination of the employment relationship between it and Seipp, and that the latter was terminated by reason of misconduct in connection with his work—for an infraction of company regulations relative to unauthorized absence. To prove an effective discharge respondent must show that at the time, an employment relationship between it and Seipp existed. And, "in the absence of any other evidence'' (R.O.B., p. 8) respondent has attempted to establish the continued existence of this relationship after October 6 by resorting to the presumption "[t]hat a thing once proved

to exist continues as long as is usual with things of that nature" (Code Civ. Proc., § 1963, subd. 32), contending that thus having proved the continued employment relationship it was entitled to, and did, discharge Seipp for having been absent for seven days without leave in violation of company regulations.

However, respondent's reliance on the presumption and on the fact the time card shows a "discharge," no more precludes inquiry into whether the "discharge" was only a matter of form, than the fact that Carter left for a cause not attributable to his employer precluded inquiry into "good cause" to determine whether he had a compelling personal reason to quit, in *California Portland Cement Co.* v. *California Unemp. Ins. Appeals Board,* 178 Cal.App.2d 263 [3 Cal. Rptr. 37]. In both cases the burden is on the employer, and in both, a determination of the vital issue can be made only in relation to the facts, which here permits the court to look past form to find the substance of the "discharge." This is not new; such inquiry is made in "trade dispute" cases under section 1262, Unemployment Insurance Code. In construing the volitional test established in *Bodinson Mfg. Co.* v. *California Employment Com.,* 17 Cal.2d 321 [109 P.2d 935], the courts look beyond form to find the subjective intent, the substance of the termination, holding that the final act is not necessarily the controlling factor in determining whether an employee voluntarily left his employment or was discharged. (*McKinley* v. *California Emp. Stab. Com.,* 34 Cal.2d 239 [209 P.2d 602] ; and *Gardner* v. *State,* 53 Cal.2d 23 [346 P.2d 193].) And it is apparent from the administrative decisions in this state, "entitled to great weight" although not necessarily controlling (*Coca-Cola Co.* v. *State Board of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1]), that an employer cannot create a "discharge" simply by so marking his records; that under section 1032 the real fact of termination shall be determined. (California Unemp. Ins. Appeals Board Benefit Decision No. 6372.) In that case the board, holding that an employee had voluntarily quit without good cause and the employer's account should not be charged, said ". . . although as a matter of form the employer discharged this claimant, the claimant herein, as a matter of actual fact voluntarily left his work when he refused to work on Sundays in accordance with the instructions of his employer."

While respondent has only to sustain its burden under the

second alternative of section 1032, the issue of discharge and whether it was for misconduct herein necessarily involves the determination of whether, in fact, Seipp voluntarily quit. With this respondent agrees—''[T]he single issue is whether Seipp was discharged or whether he quit.'' (R.O.B., p. 13); but we have no concern here with whether Seipp left respondent's employ with or without good cause except insofar as his reason for failing to report bears upon whether he then actually intended to quit. Appellant has directed our attention to a compilation in the C.C.H. Unemployment Insurance Reports of a number of out-of-state administrative decisions involving factual situations somewhat analogous to the one at bar, in which the cause of termination was determined in connection with eligibility for employment insurance benefits. Not all of these cases make express distinction between ''voluntary leaving'' and ''discharge''; but in all, inquiry was made into the true cause of the employee's failure to report for work where he never returned and was subsequently discharged, and it was concluded that he voluntarily quit. An employee, to be transferred to another shift, who left without explanation and 30 days later was terminated for his continuous absence, was held to have voluntarily left without good cause, not as having been discharged for absenteeism (Delaware, § 1975.23, p. 11,162). One, who left suitable work at a prevailing wage without choosing an available alternative to keep his job open, was held to have voluntarily left (Alaska, § 1975.16, p. 5758); so too an employee who later advised that his two-day absence was due to a drunken spree (Maryland, § 1975.163, p. 23,097), one who left for illness and did not seek reinstatement upon recovery (Michigan, § 1975.163, p. 25,225-25,226), and an employee who took a day off to attend a wedding and never returned (Missouri, § 1975.163, p. 28,-127). In Indiana and New York cases, the employee's failure to report was held to constitute a voluntary leaving without good cause and not a discharge for misconduct—in the former the employee left when he was told he could not take a leave (§ 1975.021, p. 17,151), and in the latter he refused to accept additional duties (§ 1975.035, p. 712). In a Nevada decision the board considered the employee as voluntarily separated from her work without good cause where she was found to be absent without notice to her employer (§ 1975.163, p. 31,143); the same was held by the court to be a ''voluntary quit'' in

*Maltese* v. *Unemployment Comp. Board of Review,* 190 Pa. Super. 123 [152 A.2d 773].

Thus inherent in the inquiry is the question—did Seipp's act of failing to appear for work on October 7 constitute a voluntary leaving of his employment—if it did, it was the final act of terminating the employment relationship, regardless of why he quit or whether he had good cause to do so (respondent concedes that there is no sufficient evidence in the record to show that Seipp did not have good cause for quitting), and respondent's subsequent act of "discharge" was wholly ineffective; if it did not, the employment relationship continued and respondent could, and did seven days later, properly discharge him for an infraction of a company rule regarding unauthorized absence from work. Respondent concedes that Seipp cannot in fact be discharged by it unless the employment relationship existed between them at the time (R.O.B., pp. 7, 10), submitting that the evidence supports his discharge for misconduct "assuming Seipp had not earlier terminated the employment relationship." (R.O.B., p. 7). Thus, if the evidence shows that the employment relationship ended on October 7, Seipp thereafter was no longer an employee of the respondent subject to its control, was under no obligation to report or duty to return to work and could be neither guilty of misconduct in connection with his work nor discharged from its employ; and that respondent after seven days marked his time card as a "discharge" could constitute at most a clerical act or record entry made for its own convenience in keeping its books.

To establish that Seipp was "employed at the time respondent acted to terminate the employment relationship by marking his time card a 'discharge'" (R.O.B., p. 7), respondent relies on the presumption in section 1963, subd. 32, Code of Civil Procedure, "in the absence of any other evidence." (R.O.B., p. 8.) This it urges in the face of undisputed proof that on October 7 Seipp failed to report for work and never thereafter returned or sought reinstatement; and in the face of substantial evidence, which respondent ignores, plainly pointing to the fact that on October 7 Seipp simply quit his job for other employment at better pay. In his reason for failing to report lies Seipp's intent to then quit —and little is more indicative of this intention than the low wage he earned with respondent. Intent was a factor in determining whether the employee voluntarily left in *Maltese*

v. *Unemployment Comp. Board of Review,* 190 Pa.Super. 123 [152 A.2d 773]. The court there held that one who left work "without notice or any apparent intention of returning for work" voluntarily quit without good cause. So, too, in a Michigan administrative decision (App. Bd. Dec., Dkt. B7-14937-8156) the board said: "'We find that the record and testimony clearly establishes that the claimant was absent on the days in question and that she failed to notify the employer within three days as required by the shop rule. There was apparently no reason why the claimant could not have complied with the shop rule regarding reporting had she so desired and we find her failure so to do indicates an *intention* on her part to abandon her job. It is accordingly our finding that in view of claimant's failure to report for work for three consecutive days or to notify the employer as required by shop rule, she voluntarily left her work . . .'" (emphasis added).

Seipp began driving a cab for respondent on September 26; he continued working for 11 days through October 6. There being no evidence to the contrary, we assume that during this time his work was satisfactory, he complied with all company regulations and worked steadily. For the 11 days he earned $56.70, on the basis of a five-day week, the sum of $23.95 a week. Having been issued a copy of the company regulations at the time he was hired, we also assume he was familiar with them. On October 7 Seipp did not report for work nor did he then or later communicate with respondent; after October 6 he took a job with another employer. Seipp at no time sought to have respondent keep his job open nor did he ever seek reinstatement. Bearing in mind the presumption "[t]hat a person is innocent of [a] . . . wrong" (Code Civ. Proc., § 1963, subd. 1), that he was paid $23.95 for what we assume to be a 40-hour week, that after October 6 he obtained another job, and that he never sought reinstatement with respondent, it is obvious from his act of failing to appear on October 7, that on that day Seipp intended to, and did, quit to seek or take better-paid employment. There was apparently no reason why Seipp could not have complied with the regulation requiring him to report, with which he was familiar, had he so desired and, inasmuch as his previous eleven days work was satisfactory, we find his failure to report on the twelfth day indicates an intention on his part to then abandon his job. The act of Seipp under the circumstances was as much a

voluntary leaving for other work, as was the act of Carter in *California Portland Cement Co.* v. *California Unemp. Ins. Appeals Board,* 178 Cal.App.2d 263 [3 Cal.Rptr. 37], even though the latter stated that was his reason for quitting. Therein the court said at page 271: ''There is no question but that Carter left his employment with petitioner voluntarily; he was not laid off or discharged; he left on his own; he willed and intended at the time to leave his job.'' Seipp having quit on that day had no obligation at any time thereafter to return to work for respondent.

Respondent's act of marking Seipp's time card as a ''discharge'' seven working days after he quit does not alter the effectiveness of Seipp's termination. Having severed his employment relationship on October 7, Seipp neither was bound by company regulations nor continued under respondent's control, thus, he could not have been guilty of misconduct or subject to discharge by respondent. Although leaving without notice may not be the best way to sever an employment relationship, it does not here affect the validity or effectiveness of his act of quitting. Further, we entertain a doubt that respondent then actually intended its act of discharge to terminate any employment relationship, for it never attempted to notify Seipp of its action. Marking Seipp's time card as a ''discharge'' was no more, and then intended to be no more, than a clerical function merely acknowledging in respondent's books and records, for its own convenience, that the employment relationship between it and Seipp had been terminated.

For the foregoing reasons we find that respondent has failed to establish a prima facie showing that Seipp was discharged by reason of misconduct in connection with his work, reverse the judgment of the court below and affirm the decision of the Unemployment Insurance Appeals Board.

Wood, P. J., concurred.

FOURT, J.—I dissent.

This case is a classic example of the drift in matters governmental in recent years. It is my view that in the first instance the plan of the Unemployment Insurance Act was to compensate the unemployed who were so unemployed without fault or violation on their part—it was supposedly designed to insure the diligent worker against the hazards of economic insecurity by providing him with benefit payments when un-

employed through no fault of his own—or as has been said "the purpose of the act was to minimize the burdens of involuntary unemployment, not to furnish a welcome sedative to those who prefer to drift more comfortably on the tides of indolence."

Hereinafter the respondent will at times be referred to as the company; appellants will at times be referred to as the department; and Seipp will on occasion be referred to as the employee or the applicant.

The majority opinion in this case holds in effect that the employee quit sometime before he was discharged for his misconduct (absenteeism) and that therefore the Yellow Cab Company never could have discharged him on the date the company asserts that it did so discharge him. In short, the opinion holds in effect that the employee quit before he was discharged.

Reference in the opinion is made to out-of-state administrative opinions involving factual situations "somewhat analogous" to the case before us. I have read the cited cases and in my opinion the facts in those cases are not analogous to the facts in this case.

The majority opinion employs the following phrase: "in the face of *substantial evidence, which respondent ignores, plainly pointing to the fact that on October 7 Seipp simply quit his job for other employment at better pay.*" (Emphasis added.)

The majority opinion does not point out nor make any reference to what that "substantial evidence" is or of what it consists, for the very good reason that there is not one whit of any evidence, substantial or otherwise, in the record to sustain such an assertion. The opinion further sets forth as follows: "*In his reason for failing to report lies Seipp's intent to then quit——*" It is a strange and unusual procedure for this court to attempt to spell out the reasons or the intent of the employee in this matter, when the employee himself, so far as the record discloses, never said a single word about the matter, never wrote anything with reference thereto, and in fact (as I will later point out), in effect refused to answer any questions about why his employment at Yellow Cab was terminated.

The majority opinion further indicates that the employee quit because of the low wage he received from the Yellow Cab Company and that he secured other employment at better

pay. There is nothing whatsoever in the record with reference to the rate of pay received by Seipp. True it is that the record does show (on the face of the first letter of the company to the department) "Amount of wages involved in quarter of separation $56.71," however, there is nothing whatsoever to show how many hours or how many days Seipp worked during the 11-day work period to collect such sum. I am not so naive as to believe that the union cab drivers' contract with the Yellow Cab Company provides for approximately $.64 per hour for a cab driver, which would be about the rate, had Seipp earned $56.70 and had he worked 8 hours a day for 11 days. Nor is there anything in the record with reference to Seipp's securing other employment or as to what he would have received by way of wages or earnings had he secured such other employment.

The majority opinion further states *"it is obvious from his act of failing to appear on October 7, that on that day Seipp intended to, and did, quit to seek or take better paid employment."* (Emphasis added.) Even the Department of Employment in its brief on appeal (within the department itself) from the referee's decision stated "Neither the Department nor the employer *had any information* as to whether or not claimant decided to leave his job on the *first day he failed to show up for work* or at any time——." (Emphasis added.) In the proceeding before this court the department declined to indicate just when it was that Seipp quit, but were content to maintain that it must have been sometime during the seven days of his absence. The majority of this court see fit however to assert positively that Seipp quit on the very *first* day he failed to show up for work—this in the face of absolutely no word or expression whatsoever from Seipp as to what he (Seipp) had in mind about the matter, if anything. The guess of the one is as good as the guess of the other for as pointed out, there is nothing to support either guess.

It may be well to extend the statement of the facts in this case to set forth correctly at least a part of the record which the majority of the court have omitted. When the company received the notice from the Department of Employment with reference to the claim of Seipp to draw from the reserve account of the company, the company on June 6, 1957, notified the department in writing as follows: *"The claimant was discharged by us for misconduct.* The claimant was discharged for having been absent without leave. Company rules

state that any employee absent without leave for seven days will be discharged. Claimant's last day of work was 10-6-56 and, although he did not return, his time card was held until 10-14-56 and then marked AWOL and sent to the Payroll Department for clearance. (Emphasis added.)

"These facts are supported by company business records. . . ."

On June 12, 1957, the Department of Employment wrote to Seipp at his San Francisco address with reference to his claim for benefits and stated to him that the company "states that you left his employment on October 6, 1956 because: *you voluntarily* quit on October 6, 1956 with no reason given." (Emphasis added.)

It is to be noted that the letter of the Department of Employment to Seipp in no wise correctly set forth the contention of the Yellow Cab Company. Whether the error was deliberate or not, I do not know. It is interestingly true, however, that the statement therein made, namely, that Seipp voluntarily quit on October 6, 1956, with no reason given, is what the Department of Employment ultimately held to be the fact without any evidence to sustain it, and the majority of this court have supported that position. In any event the Department of Employment in the same letter of June 12th advised Seipp that it would be necessary for him to furnish certain information within ten days to the end that the Department of Employment could "comply with the law in answering the above statement"—namely the assertion of the Yellow Cab Company. The following was then set forth in the letter:

"1. If you were laid off or discharged, explain details on reverse.

"2. If you left because of personal circumstances, explain details on reverse.

"3. Were you dissatisfied with your job? [ ] Yes [ ] No.
If 'Yes,' answer following:
a. Length of employment _____ years _____ months.
b. Hours of work _____ to _____. Number of days per week.
c. Rate of pay $_____ per _____ (day, week, month).
d. Why were you dissatisfied with the job? _____

"4. Did you leave to take another job? [ ] Yes [ ] No.
 If 'Yes,' answer following questions about the new job:
 a. Date you obtained the new job _____. Date you went to work _____.
 b. Name and address of new employer _____.
 c. Hours of work _____ to _____. Number of days per week. _____.
 d. Starting rate of pay $_____ per _____ (day, week, month).
 e. Was the new job temporary? _____ Permanent? _____
 f. What was the main reason why you changed to the new job? _____."

A self-addressed envelope was enclosed for the convenience of Seipp in mailing his replies to the questions to the Department of Employment.

Section 1963, Code of Civil Procedure, subdivision 24 provides: "That a letter duly directed and mailed was received in the regular course of the mail." It is therefore assumed, in the absence of anything to the contrary, that Seipp received the letter from the department.

Seipp did not answer any of the questions and the records of the Department of Employment indicate in handwriting on the face of its own copy of the letter that there was "No response" by Seipp.

The Department of Employment thereupon ruled and gave notice thereof to the Yellow Cab Company on July 5, 1957, and set forth the reason for the unfavorable ruling as follows:

"You allege that the Claimant was discharged for misconduct—failure to call in when absent from assigned work. However, since Claimant discontinued reporting for work without notifying the Employer and continued to absent himself from work, it must be concluded that he voluntarily quit the employment instead of being discharged.

"The information submitted by you does not reasonably show and the Department has no facts in its possession which justifies the conclusion that Claimant quit without 'good cause.'"

The cause was appealed by the Yellow Cab Company to a referee and after the testimony of an employee of the company was taken, the referee reversed the Department of Employment ruling and held in effect that the employee, Seipp, was discharged by the company for misconduct. No

evidence was introduced at the hearing before the referee in behalf of the applicant.

The department on its own motion then set aside the decision of the referee and took over the matter. At what was supposed to be a hearing on the matter (which hearing was never held) an order was made by the department to the effect that the cause would be submitted upon briefs. No further testimony was taken nor was any other evidence received.

The department thereafter ordered in effect that because in other cases it had ruled in favor of the employee, therefore in this case the order would be "that the claimant voluntarily left the employer's employ"; it then held that the employee's having left voluntarily, the employer's account in effect was chargeable for benefits for the employee and further that therefore it was not necessary "to discuss whether the employer established a prima facie case that the claimant was discharged for misconduct connected with his work"; and thereupon affirmed the department's previous ruling.

It must be remembered in this case that Seipp said nothing and submitted nothing and the department submitted nothing with reference to how or why Seipp was terminated and any statement in any brief, opinion or decision with reference to why or how the termination occurred, so far as Seipp was concerned, is purely conjecture, speculation, supposition and guess-work. The only evidence whatever in the record is that he was discharged by the company for misconduct. For all we know Seipp may have had some personal reason for terminating the employment which was perfectly justifiable had he come forward with the facts; he may have taken an asthmatic friend to Arizona, he may have been in jail, he may have laid off to go into business for himself to the end that he could perhaps make a great deal of money for himself, he may have just wanted a compensated rest or it may be that he was allergic to hard work with what the majority of this court term poor pay and was out looking for light work with high wages.

Fortunately or unfortunately there is no evidence to support any of the mentioned possibilities, including the possibility as contended for by the majority of this court. I am of the belief that no judgment should be grounded on impulse, whim or fancy. To so hold is to set up dangerous and poorly located guide posts which ultimately will result in opinions being tailored to fit the view that unemployment insurance

reserves should always be tapped. Much mischief will be created by such a course. In other words, it is my belief that the opinion of the majority of this court sponsors the view that practically all unemployed workers ought to receive unemployment insurance benefits willy-nilly and without regard to the disqualification limitations of the statutes.

Disqualification provisions were written into the law in the first instance to prevent those who were not entitled to benefits from depleting the funds which are set up and made available to those who are entitled thereto.

There is nothing in the record before this court showing any illness of Seipp or that his health would have been endangered from continuing with the job, that the duties were too arduous or that he needed a change of scenery. It appears to me that an employee owes some responsibility and consideration to and for an employer and he ought to conduct himself accordingly; and that if the employee quits, the reason for such ought to be a compelling one, not an imaginary, trifling or whimsical one or one negligently or willfully unexpressed to the company in violation of the company rules. There is not an iota of evidence in the record in this case to the effect that the working conditions were abhorrent or unbearable and no longer suitable to Seipp.

No matter from what direction this case is approached, the conclusion is inescapably reached that the necessary element for an absolute accurate determination of why Seipp absented himself from his job is subjective in nature "in that it abides in the mental attitude of the claimant."

We must further keep in mind that the applicant Seipp was in effect asked if he left the work because of personal circumstances and if so, to explain the details thereof—he was asked if he was dissatisfied with the job and if so to relate why and to tell how long he had been on the job, what the rate of pay was, and the hours of work—he was asked if he left the Yellow Cab Company to take another job and if so, what was the main reason for changing to the new job. He gave no answers in spite of the fact that the Department of Employment told him in writing that it was necessary to have the answers to such questions in that the company had asserted that he had "voluntarily quit on October 6, 1956." In fact, as heretofore set forth, the company had told the Department of Employment that Seipp was discharged for misconduct. In any event, what inferences are to be drawn from the facts?

Code of Civil Procedure, section 1958, provides as follows: "An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." An inference can be founded on a fact legally proved.

Code of Civil Procedure, section 1832 provides as follows: "Indirect evidence is that which tends to establish the fact in dispute by proving another, and which, though true, does not of itself conclusively establish that fact, but which affords an inference or presumption of its existence. For example: a witness proves an admission of the party to the fact in dispute. This proves a fact, from which the fact in dispute is inferred."

Code of Civil Procedure, section 1833 provides: "Prima facie evidence is that which suffices for the proof of a particular fact, until contradicted and overcome by other evidence. For example: the certificate of a recording officer is prima facie evidence of a record, but it may afterwards be rejected upon proof that there is no such record."

The inquiry by the department was a proper one. It appears to me that it is reasonable to infer that Seipp refused, or at least failed or neglected, to answer the questions because true answers might have disqualified him from collecting from the company's reserve account. There was nothing cruel or inhuman in asking him why he quit, if he did so quit. To have the proper answers in effect was a prerequisite to collecting the benefits. He was the moving party to collect the benefits and yet, when confronted with simple questions as to just what did take place in the termination of his employment, he saw fit to make no response and to remain mute. It is a fair inference, under the circumstances, that for him to answer the questions correctly and truthfully meant that he would expose himself to a rejection of his claim—otherwise why would he refuse to tell the truth about the entire matter? Had he quit as the Department of Employment holds that he did so quit, would he not have been incensed and resentful of the company's saying that he had "voluntarily quit—with no reason given" and that he should not participate in benefits from their reserve account? It appears to me that had he not recognized that he had been justifiably discharged, he would indeed have been resentful of the imputation by the company that he was attempting to collect on a false claim and that he would forthwith have provided the answers to the questions by the Department of Employment.

The only apparent purpose of the questions put to Seipp in the letter, as pointed out to him by the department, was to assist in the determination of his eligibility to draw on the company's reserve. In fact, I doubt that more pertinent questions could have been asked of Seipp. The strength of an inference depends upon the questions asked. There is a legitimate inference to be drawn from his refusal to provide the answers to the questions in the face of what was tantamount to an accusation by the company that his claim was a fake, and that inference is not that he quit voluntarily.

Silence and reluctance to answer such simple and yet important questions and to face up to the situation at hand compel me to draw an inference which is adverse to Seipp. He was in a position to admit or deny or explain the charge of the company and he did nothing and said nothing. Why did he seemingly dread to tell the truth in answering the inquiries of the department?

In my opinion there is a decided difference between mere absence from work and the leaving or quitting work. Seipp in this case was obviously and admittedly absent from work for seven days, and according to the company rules such conduct without an excuse therefor constituted cause for discharge. In this case the Department of Employment from the very first instance sought to and did manufacture excuses and alibis for the applicant—he, the applicant, never spoke one word for himself and the majority of this court adopt the interpretation of the Department of Employment with no basis in fact to support it.

There should, of course, be a liberal interpretation of the Unemployment Insurance Act, but there ought also to be at least a semblance of a foundation of something in the way of evidence upon which to base the judgment. Supposition, conjecture, speculation and a desire to do good should not suffice. There ought to be some balancing of interests, taking into consideration the welfare of the employer and the general public.

The employee in this case knew of the regulations of the employer to the effect "Should you be sick, or for any valid reason unable to work, notify your garage superintendent not less than 2 hours before the time you are due out." Seipp never contacted the employer on any occasion whatsoever. In these days of modern communication Seipp (assuming he remained in a metropolitan area) could have telephoned from

any of thousands of places; indeed it would be difficult to imagine that he could have been in excess of a block away from a telephone at any time. Yet he never called, never wrote a postal card and never sent a telegram or message to the employer about his absence. This constituted a failure to comply with the rules of the company and showed lack of responsibility upon his part and a disregard of ordinary standards of behavior which the company had a right to expect of him and yet the department and this court in effect place their stamp of approval upon such conduct.

At the oral argument it was asserted by the attorney for the company and not denied by the attorney general that during the time between Seipp's last day of actual work and his discharge, the company made payments to the Teamsters' Security fund in behalf of Seipp, paid on his company insurance and that his job was held open for him during such time.

There was testimony in behalf of the company to the effect that if any driver had any intention to quit, the driver would fill out a notice of voluntary termination with the garage superintendent and thereupon terminate the employment. The rebuttable presumption contained in section 1963, subdivision 32 of the Code of Civil Procedure that "a thing once proved to exist continues as long as is usual with things of that nature" is applicable to the present situation. The fact of employment was established. As set forth above, the testimony showed that if a driver had any intention to quit he would fill out a notice of that fact. The employee did not fill out such notice.

Section 1030 of the Unemployment Insurance Code at the time in question read as follows:

"Any employer who is entitled under Article 3 of Chapter 5 of this part to receive notice of the filing of a new or additional claim or notice of computation may, within 10 days after mailing of whichever is the earlier of such notices, submit to the department any facts within its possession disclosing whether the claimant left such employer's employ voluntarily and without good cause or was discharged from such employment for misconduct connected with his work. The department shall consider such facts together with any information in its possession and promptly issue to the employer its ruling as to the cause of the termination of the claimant's employment. Appeals may be taken from said rulings in the

same manner as appeals from determinations on benefit claims.''

Section 1032 of the Code read as follows:

''If it is ruled under Section 1030 or 1328 that the claimant left the employer's employ voluntarily and without good cause or was discharged by reason of misconduct connected with his work, benefits paid to the claimant subsequent to the termination of employment due to such voluntary leaving or discharge which are based upon wages earned from such employer prior to the date of such termination of employment, shall not be charged to the account of such employer unless he failed to furnish the information specified in Section 1030 within the time limit prescribed in that section.''

There is no presumption with which I am familiar, and the department and the majority of this court have pointed to none, which is to the effect that an employee by his mere absence from work has affirmatively acted to thereby terminate his employment. However, that is the basis and the effect of their holding. If that be the law then many an employee will ultimately wish it were otherwise. For example, if the employee in this particular case had started into the company's garage on the seventh day of his absence with the thought of going to work and had he then been struck down and severely injured, by the cab of a coworker leaving the garage, does anyone think that he, Seipp, would not have made an application for (and probably recovered) industrial accident benefits as an employee of the Yellow Cab Company? Had such occurred and had he been awarded benefits he would be surprised indeed to have this court reverse the award on the theory that in fact he quit on the first day of his absence from work and therefore he was not entitled to any benefits for the injuries sustained.

It may be that it is presently fashionable to stretch and distort the statute in question to the end that practically any claimant can recover benefits without regard to the disqualification provisions of the statute. It is a weak and mistaken view, and experience will teach that it is fallacious. The majority of this court have built a hurdle over which an employer will find it next to impossible to negotiate because in effect the opinion does away with any restrictions which tend to maintain a substantial reserve fund in the employer's account and in effect declares it to be open season on all such reserve funds.

I cannot concur in what seems to me to be the giving of a premium for a failure to comply with ordinary rules of common sense in the employer-employee relationship. Apparently, an employee can now walk off a job, leave the employer in a dilemma as to whether or not to hire someone else to fill the position, whether to continue to pay certain employee benefits by way of insurance premiums and other charges with the probability that the employee some months later will secure an award for unemployment insurance benefits paid in part from the employer's reserve account because the employee is now unemployed.

I would affirm the judgment.

Respondent's petition for a hearing by the Supreme Court was denied October 4, 1961. Schauer, J., was of the opinion that the petition should be granted.